FILED

2026 Mar-10  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JORGE A. OTERO-ACEVEDO,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  2:24-CV-00556-RDP** |
| } | |
| **MORRIS-SHEA BRIDGE COMPANY,** } | |
| **INC.,** } | |
| } | |
| **Defendant.** } | |

### <u>MEMORANDUM OPINION</u>

Before the court are Defendant Morris-Shea Bridge Company's Motion for Summary Judgment (Doc. # 22) and its Motion to Strike (Doc. # 32). The Motion for Summary Judgment has been fully briefed. (Docs. # 24, 28, 31). Plaintiff did not respond to the Motion to Strike. After careful review, and for the reasons discussed below, Defendant's Motion for Summary Judgment is due to be granted in part and denied in part, and Defendant's Motion to Strike is due to be denied as moot.

### I.    Background[1]

Defendant Morris-Shea Bridge Company, Inc. ("MSB") is a foundation contractor that primarily installs deep foundation systems for commercial and infrastructure projects throughout the United States, the Caribbean, and South America. (Doc. # 23-1 at 34:5-16). MSB has four

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

permanent locations: Irondale, Alabama; Harpersville, Alabama; Angleton, Texas; and Laccasine, Louisiana. (Doc. # 23-2 at 46:7-47:18).

MSB's Equipment Yard is in Harpersville, Alabama, and that is the relevant location related to the facts here. At the yard, MSB repairs machines and augers, fabricates steel cages, manages fleet vehicles, and stores parts, among other things. (Doc. # 23-3 at 46:20-47:2). Chief Logistical Officer Steve Shea is the highest-ranking employee working at the yard. (Doc. # 23-2 at 44:3-5, 46:1-47:2). Michael McPhillips is the Operations Manager at the yard, and he reports directly to Shea. (Doc. # 23-3 at 10:1-8). Nicole Gwinette worked in the Harpersville office as an in-house clerical person reporting to McPhillips. (Doc. # 23-2 at 174:20-175:6).

### A.    MSB hires Plaintiff

Plaintiff Jorge Otero-Acevedo ("Plaintiff") was born in Puerto Rico and is Hispanic. (Doc. # 1 ¶ 15). On August 1, 2022, Shea hired Plaintiff to be the Trucking/Shipping Manager at the MSB Equipment Yard. (Docs. # 23-2 at 169:2-3; 1 ¶ 16). Luis Rodriguez, MSB's Operations Manager at the time, referred Plaintiff to MSB. (Docs. # 23-4 at 13:11-21; 23-2 at 168:23-169:3). Plaintiff was qualified to hold the position, and as part of the interview and hiring process, Plaintiff visited the yard and met with Shea, Rodriguez, and other yard employees. (Docs. # 23-4 at 14:14-16:22; 23-3 at 54:12-16). After the visit, Shea hired Plaintiff. (Docs. # 23-2 at 169:2-3; 23-4 at 120).

As Trucking/Shipping Manager, Plaintiff oversaw the shipping department, scheduled incoming and outgoing loads of equipment to job sites, and performed inspections on trucks and trailers. (Doc. # 23-4 at 30:4-32:12, pp. 120-24, 130). Plaintiff reported to Dick Shea (President); Richard Shea, Bill Shea, and Steve Shea (Vice Presidents); and Luis Rodriguez (Operations Manager). (*Id.* at pp. 120-24). When Michael McPhillips was rehired as Operations Manager in

November 2022, Plaintiff began reporting to McPhillips. (Docs. # 23-3 at 7:23-8:2, 9:18-19; 23-4 at 35:9-18). Rodriguez resigned a few weeks after McPhillips was rehired. (Doc. # 23-3 at 12:3-23).

Shortly after Plaintiff started working for MSB, another MSB employee, Mike Demarco, send a text message to Shea and Rodriguez stating, "I like the shit out of Jorge. Big time asset! Good guy. Very knowledgeable. Just met with him and Shane." (Doc. # 23-4 at p. 139). Rodriguez responded, "He is a fucking Puertorrican [sic] But he is a great guy." (*Id.*; 23-2 at 199:9-13). Shea[2] claims that he did not respond to the texts and instead called Rodriguez and told him to stop using the phrase "fucking Puerto Rican." (Docs. # 23-4 at p. 139; 23-2 at 199:1-202:4).

Plaintiff and Shea disagreed at times about how the shipping department should operate. For example, after observing that a driver routinely operated his truck at unsafe speeds well above the speed limit, Plaintiff reduced the vehicle's maximum speed setting. (Doc. # 23-4 at 184:1-188:5). Shea reacted by yelling at Plaintiff and then reset the truck's maximum speed setting to 100 miles per hour. (*Id.* at 163:11-165:16, 196:7-18). In another instance, Plaintiff wanted to suspend a driver due to repeated accidents, but McPhillips refused to approve the suspension. (*Id.* at 192:13-195:11).

Plaintiff alleges that Shea used the phrase "Puerto Rican way" to describe situations where they should disregard the law and regulations just to get it done. (Doc. # 23-4 at 90:8-11).[3]

---

[2] Although there are several Sheas working for MSB, the court refers to Steve Shea as "Shea" throughout this opinion.

[3] Shea testified that he uses the phrase "Puerto Rican way" as a term of endearment and praise, meaning that employees should work hard, dig in, and find a way to get things done. According to Shea, he uses the phrase to encourage people to work diligently, think through problems, and be resourceful in accomplishing their tasks. (Docs. # 23-2 at 193:20-194:13; 23-3 at 90:7-91:16).

According to Plaintiff, Shea used this offensive phrase when Plaintiff expressed concerns that a truck load was "not legal or it's going to be overweight." (*Id.* at 89:21-91:8). Plaintiff also claims that Shea was disrespectful to him, used "bad words," told him to "shut up," and got in Plaintiff's face. (Doc. # 23-4 at 86:2-19). Plaintiff stated that Shea often told "stories about the prostitutes in Puerto Rico and the drugs [there]," which he found offensive. (*Id.* at 88:22-89:3, 92:16-22). Shea also made derogatory remarks about MSB's Venezuelan workers, including statements suggesting that they steal and are lazy, and he characterized Hispanics as a group this way. (*Id.* at 92:10-93:4). Plaintiff testified that Shea told him to learn to speak "redneck or hillbilly," and if he was "going to be [at MSB], you need to learn how to speak . . . like us." (*Id.* at 87:11-88:14).

Even though Plaintiff was a supervisor, Plaintiff claims that McPhillips "made a point of sending" him into the yard to clean up. (*Id.* at 108:21-109:4). Plaintiff acknowledges that he was responsible for keeping the yard's loading and unloading areas clean and organized, but says doing the actual cleaning of the yard was not part of his job responsibilities. (*Id.* at 119:15-120:3, p. 130). Rather, he contends this was a task he was to supervise other employees in performing. (*Id.* at 119:15-120:3). Plaintiff viewed being required to clean the yard insulting and demeaning because he "is a professional" and "wasn't originally hired to [do] cleaning." (*Id.* at 113:5-12).

### B.    Plaintiff complains to Gwinette

MSB's handbook includes an Equal Employment Opportunity ("EEO") Policy that identifies Richard Shea III as the company's EEO Officer responsible for administering and promoting an active program of equal employment opportunity. (Doc. # 27-3 at 5-6). The EEO policy did not identify where employees should file a discrimination complaint. (*Id.*)

Plaintiff understood that Gwinette served in the role of Human Resources for MSB because she was introduced to him as HR when he was hired, was present when employees

received discipline, and handled traditional HR duties. (Docs. # 27-9 ¶ 6; 23-4 at 137:2-19). Plaintiff testified that he did not feel there was anyone else to whom he could complain about Shea. (Doc. # 23-4 at 141:16-21). Consistent with that perception, MSB's Rule 30(b)(6) designee testified in deposition that, when asked who could address complaints about someone in Shea's position of authority, he did not know that anyone could discipline the Sheas. (Doc. # 23-1 at 50:22-52:8). Plaintiff never complained to Shea about discrimination, harassment, hostile work environment, or retaliation. (Docs. # 23-4 at 141:16-21; 23-8 ¶¶ 8-14).

Within his first month of employment, Plaintiff reported to Gwinette that he believed McPhillips and Shea yelled at him because he was Puerto Rican and that they were "always talking about Puerto Rico and all the BS that happened down there." (Doc. # 23-4 at 137:20-141:21). When Plaintiff raised these concerns, Gwinette responded by questioning Rodriguez about why he had brought Plaintiff to work at MSB given the circumstances. (*Id.* at 139:8-22). Plaintiff later complained to Gwinette that he was not being allowed to do his job the way he wanted to do it. (Doc. # 23-7 at 15:16-16:8). Although Plaintiff complained about Shea and McPhillips, no one complained to Gwinette about Plaintiff. (Doc. # 23-7 at 19:13-15).

### C.    Plaintiff is suspended by MSB

Before Plaintiff was employed with MSB, he ran his own transportation business and owned three trucks. (Doc. # 23-4 at 17:3-15). When Plaintiff began working at MSB, he and MSB entered into a lease agreement to use Plaintiff's trucks as part of its fleet in exchange for a monthly rental fee. (*Id.* at p. 125). The lease required Plaintiff to have the trucks in good working condition and in compliance with all legal requirements and regulations before MSB began using them. (*Id.* at pp. 125-26).

5

When MSB began discussing terminating Plaintiff's employment in January 2023, McPhillips contacted MSB General Counsel, Vivian Campbell, to discuss Plaintiff's potential termination and any legal implications related to the trucking lease. (Doc. # 23-5 ¶¶ 13, 15). MSB decided a severance agreement made the most sense to effect termination of Plaintiff's employment and the lease. (Docs. # 23-2 at 221:7-18; 23-3 at 135:4-14). Beginning in January 2023, Campbell, McPhillips, and Shane Moore (MSB's Safety Director) exchanged various versions of the severance agreement. (Doc. # 23-5 at ¶ 19).

Also in January 2023, McPhillips was concerned that one of Plaintiff's trucks was out of DOT compliance and had been since MSB began using it five months earlier. (Doc. # 23-3 at 69:23-70:20). Plaintiff disputes this claim. In his deposition, he testified that the trucks had passed inspection and received inspection stickers, and that he contacted Truckworx, which confirmed the truck had passed inspection. (Docs. # 23-4 at 50:8-54:17, 55:15-57:18).

Although McPhillips considered terminating Plaintiff when he discovered the alleged compliance issue, he instead suspended Plaintiff without pay for three days – from February 8 through February 13, 2023. (Doc. # 23-3 at 69:19-70:20). The suspension notice did not reference any prior safety violations or disciplinary history. Plaintiff disagreed with the stated basis for the suspension and submitted a written rebuttal. (Docs. # 23-4 at 50:8-54:17; 23-3 at pp. 63-64).

When Plaintiff returned from suspension on February 14, 2023, inspection paperwork he kept in his office was missing. (Doc. # 23-4 at 145:7-146:1). Plaintiff also found an inspection report dated February 9 that identified Plaintiff as the inspector, but Plaintiff says he did not and could not have done the inspection because he was suspended at that time. (Doc. # 23-4 at 147:3-152:17). Plaintiff testified that, on that same day, he told Gwinette that his name had been

6

falsified on the February 9 inspection report and that he was considering calling the Department of Transportation. (Doc. # 23-4 at 147:3-154:16). Obviously, for purposes of this motion, the court must view the evidence in the light most favorable to the non-movant.

### D.    Steve Shea terminates Plaintiff

Shea terminated Plaintiff on February 14, 2023, during a heated exchange he had with Plaintiff. (Doc. # 23-3 at 46:7-8, 191:1-8). Most of the facts surrounding the conversation are disputed. (Docs. # 23-2 at 211:1-7; 23-4 at 68:22-69:1).

The parties agree that Shea confronted Plaintiff about various alleged workplace transgressions, but Plaintiff claims all of those are fabricated, and he rebutted each of them. (Doc. # 23-4 at 68:22-73:23). First, Shea questioned the inspection status of one of Plaintiff's trucks, but Plaintiff called a truck mechanic on speakerphone to confirm that the mechanic had inspected the truck and signed off on it. (Docs. # 23-2 at 208:12-209:4, 219:5-8; 23-4 at 69:8-73:2). Shea also accused Plaintiff of improperly using company resources to transport one of Plaintiff's personal trailers from Florida to Alabama. (*Id.*). Plaintiff testified that he had obtained prior approval from Rodriguez to use a broker, paid for the shipment himself, and produced his credit card statement to prove it. (*Id.*). Plaintiff also called the broker during the confrontation and obtained a receipt showing that he personally paid the cost. (*Id.*). After Plaintiff refuted these accusations, he told Shea that he was "just looking for excuses to get rid of" him. (*Id.*). Shea responded by saying he could not stand looking at Plaintiff's face anymore, stated that he had already spoken with McPhillips about Plaintiff's exit package, and told Plaintiff to "get out of here." (*Id.*). Plaintiff described the interaction as largely one-sided, stating that Shea was yelling and cursing, and Plaintiff did not scream back. (*Id.*).

At the end of the conversation, Shea called McPhillips and told him that Plaintiff was no longer working for MSB; but, Shea did not provide details of his conversation with Plaintiff. (Doc. # 23-3 at 50:9-52:6). Although MSB's payroll change notice documents the reason for Plaintiff's separation of employment was "QUIT," Plaintiff was fired and had no intention to quit. (Docs. # 23-4 at 76:9-10; 27-5). The parties do not dispute that Shea terminated Plaintiff. (Doc. # 28 ¶ 36; *see generally* Doc. # 31). Shea, Moore, and McPhillips offered Plaintiff a severance package contingent upon him agreeing not to sue the company for any claims related to his employment. (Docs. # 23-3 at 134:22-136:7; 27-8).

Less than a week after Plaintiff's termination, MSB rehired Michael Brown, who is White, to replace Plaintiff. (Docs. # 27-2 ¶ 9; 27-12 at 31; 23-3 at 104:2-3). Over his 18 years with MSB, Brown received a number of writeups for various conduct including: (1) making a bomb from liquid nitrogen and a coke bottle which "put[] himself and other employees in an unsafe situation"; (2) a reprimand for noncompliance with company policy regarding reporting equipment repairs; (3) a termination for "Poor Job Performance" and "Insubordination"; (4) a subsequent termination for failing to perform inspection duties; (5) a subsequent reprimand for a safety violation; and (6) a separation of employment where he quit without notice and was "blackballed for life." (Doc. # 27-12). Brown's most recent disciplinary action occurred in 2019 when he was last employed by MSB, which was over six years before he replaced Plaintiff. (*Id.*).

### E.    Plaintiff takes post-termination actions

Following his termination, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. # 1-1). MSB responded to Plaintiff's EEOC charge by stating that it disciplined him in January 2023 after a driver received a DOT violation and suspended him in February 2023 for placing an uninspected truck on the road.

(Doc. #27-7). MSB did not identify any other performance or behavioral issues supporting termination but stated in a footnote that on January 31, it disciplined Plaintiff for working on an aerial manlift without proper fall-protection devices. (*Id*.). MSB told the EEOC that it terminated Plaintiff "due to the unsatisfactory job performance issues." (*Id*.).

During his employment with MSB, Plaintiff planned to file a complaint with OSHA regarding the mistreatment of drivers and being forced to engage in noncompliant or illegal practices. (Docs. # 23-4 at 79:16-80:16; 1-3). Plaintiff filed his complaint with OSHA on August 14, 2023. (Doc. # 1-3).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of a material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of*

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'What we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (citations omitted).

## III.    Discussion

Plaintiff's Complaint asserts nine causes of action against MSB: discriminatory termination under Title VII and 42 U.S.C. § 1981; discriminatory hostile work environment under Title VII and 42 U.S.C. § 1981; retaliation under Title VII, 42 U.S.C. § 1981, and the Surface Transportation Assistance Act; and retaliatory hostile work environment under Title VII and 42 U.S.C. § 1981. (Doc. # 1 ¶¶ 87-190).

In employment discrimination cases, courts have historically applied the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973).

10

However, in recent years our circuit has made clear that the *McDonnell Douglas* model is not the exclusive method for fending off summary judgment. *Ismael v. Roundtree*, 161 F.4th 752, 763-64 (11th Cir. 2025); *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Regardless of whether a plaintiff can satisfy the *McDonnell Douglas* model, the court must still consider whether the record as a whole presents a "convincing mosaic" of circumstantial evidence from which a reasonable jury could infer intentional discrimination. *Id.*

The convincing mosaic standard states that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328. "[The Eleventh Circuit] has used the phrase 'convincing mosaic' simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action – the ultimate inquiry in a discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). "That evidentiary picture may include, 'among other things,' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342 (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

### A.    Plaintiff's Discriminatory Termination Claims

Plaintiff has presented evidence of discriminatory animus by Steve Shea, the decisionmaker in this case. Plaintiff testified that Shea repeatedly invoked the phrase "Puerto Rican way" to suggest cutting corners or disregarding legal requirements and made derogatory

generalizations about Hispanic workers (*i.e.*, that they are lazy or prone to theft). (Doc. # 23-4 at 89:21-91:8, 92:10-93:4). Plaintiff also described offensive comments made about Puerto Ricans. (*Id.* at 88:22-89:3, 92:16-22). Although Shea denies these allegations, and a jury may ultimately credit Shea's denials (or explanations), at the summary judgment stage, the court must resolve all reasonable doubts about the facts and all justifiable inferences in favor of Plaintiff, the non-movant. *See Fitzpatrick*, 2 F.3d at 1115.

The evidence regarding Plaintiff's replacement further contributes to the mosaic. Plaintiff was replaced within days by Michael Brown, who is White and who a jury could find had a much more significant disciplinary history at MSB than Plaintiff, including prior terminations and safety violations. (Docs. # 27-22 at 7; 27-12 at 31; 23-3 at 104:2-3). Although Brown's most recent discipline occurred years earlier, there is a material issue of fact about whether MSB's willingness to rehire and reinstall Brown into Plaintiff's role, despite that history, undercuts its stated reasons for discharging Plaintiff.

Shea's racial comments are evidence that he harbored a discriminatory animus towards Puerto Ricans and/or Hispanics. Viewed in the light most favorable to Plaintiff, the record is not "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The combined evidence – including (1) Shea's derogatory comments about Puerto Ricans and Hispanics and (2) Plaintiff's replacement by a White employee with a more significant disciplinary history – presents a sufficient convincing mosaic from which a reasonable jury could conclude that Plaintiff's national origin was a motivating factor in his termination. *See Tynes*, 88 F.4th at 946. Accordingly, MSB's motion for summary judgment as to Plaintiff's discriminatory termination claims is due to be denied.

### B.    Plaintiff's Discriminatory Hostile Work Environment Claims

A plaintiff attempting to show that he has experienced a hostile work environment must prove that: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race or national origin; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under either a theory of direct or vicarious liability. *See Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982); *see also Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). It is not disputed that Plaintiff, as a Puerto Rican Hispanic male, belongs to a protected group.

First, a reasonable jury could conclude that Plaintiff was subjected to unwelcome harassment and that the harassment was based on his race. Within weeks of Plaintiff's hire, Rodriguez called him a "fucking Puertorrican [sic]" in a text message to MSB's senior leadership. (Doc. # 23-4 at p. 139). He also presented evidence that Shea repeatedly referred to the "Puerto Rican way" to justify cutting corners or disregarding legal requirements (*id.* at 90:8-11), made offensive comments about prostitutes and drugs in Puerto Rico (*id.* at 88:22-89:3, 92:16-22), and made generalized statements indicating that Hispanic workers steal and are lazy (*id.* at 92:10-93:4). Plaintiff also testified that, in the context of his racially charged remarks and his discharge, Shea yelled at him, cursed, got in his face, and told him to "shut up." (*Id.* at 86:2-19).

The requirement that the harassment be "severe or pervasive" contains both an objective and a subjective component. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.

13

2002). Four factors are considered in analyzing whether the harassment is sufficiently severe and pervasive: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening and humiliating, and (4) whether the conduct unreasonably interferes with the employee's job performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The court must examine the conduct in context and determine, under the totality of the circumstances, whether the alleged conduct creates a hostile or abusive working environment. *Mendoza*, 195 F.3d at 1246; *Miller*, 277 F.3d at 1276-77; *see Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1286-87 (11th Cir. 2018) ("[T]he Supreme Court has made clear that no single factor is required to establish the objective component." (cleaned up)). In evaluating hostile work environment claims at the Rule 56 stage, a panel of the Eleventh Circuit has explained:

> [W]e must bear in mind that "Title VII is not a federal civility code." To be actionable, the conduct must be serious enough to alter to the terms and conditions of employment. Evidence of "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" is insufficient. So too is "the sporadic use of abusive language" or other ordinary incidents of the workplace. Nevertheless, because we look to the totality of the circumstances, we must "examine the conduct in context, not as isolated acts."

*Ortiz v. Sch. Bd. of Broward Cnty.*, 780 F. App'x 780, 784 (11th Cir. 2019) (quoting *Mendoza*, 195 F.3d at 1245; *Faragher*, 524 U.S. at 786-88) (internal citations omitted).

Plaintiff was employed by MSB for less than six months. During that time, Shea used of the phrase "Puerto Rican way" to refer to unethical or illegal conduct (Doc. # 23-4 at 90:8-11), made remarks about prostitutes and drugs in Puerto Rico (*id.* at 88:22-89:3; 92:16-22), and generalized that Hispanic workers steal and are lazy (*id.* at 92:10-93:4). Plaintiff testified these comments were recurring, not isolated. The alleged conduct went beyond mere offhand

comments. Shea was the highest-ranking employee at the yard, (Doc. # 23-2 at 44:3-5), and a jury could conclude that his conduct carried greater weight for that reason.

There is also evidence of threats and humiliation. Plaintiff testified that Shea yelled at him, cursed at him, told him to "shut up," and got in his face several times. (Doc. # 23-4 at 86:2-19). Shea denies this occurred. Whether that conduct was sufficiently threatening or humiliating behavior and whether it was racially motivated is a jury's call. Plaintiff also claims he could not discipline a driver with a repeated accident history (*id.* at 192:13-195:11) and watched Shea undo his safety-based decision and reset a truck's speed to 100 miles per hour (*id.* at 163:11-165:16). Plaintiff also testified that, although he was a supervisor, McPhillips "made a point of sending" him into the yard to clean, something that was not part of his job responsibilities. (*Id.* at 108:21-109:4, 119:15-120:3).

Further, there is evidence that there was no meaningful avenue to complain about Shea's conduct. Shea was part of the company's leadership (Doc. # 23-4 at 141:16-21), and even MSB's Rule 30(b)(6) designee was unsure who could discipline a member of the Shea family (Doc. # 23-1 at 50:22-52:8). A jury could find that marked absence of a clear complaint mechanism in the EEO policy indicated that discriminatory conduct by a high-ranking decisionmaker was tolerated at MSB. (Doc. # 27-3 at 5-6).

From this evidence, a reasonable jury could conclude that MSB subjected Plaintiff to a hostile work environment because of his race or national origin. Accordingly, Defendant's motion for summary judgment on his hostile work environment claims is due to be denied.

## C. Plaintiff's Retaliation and Retaliatory Hostile Work Environment Claims under Title VII and § 1981

Plaintiff's retaliation and retaliatory hostile work environment claims, asserted under both Title VII and § 1981, are governed by the same analytical framework. *Berry v. Crestwood*

*Healthcare LP*, 84 F.3d 1300, 1309 (11th Cir. 2023). Because retaliation claims under Title VII and § 1981 are governed by the same analytical framework, the claims necessarily rise or fall together. *Id.*; *see CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452-57 (2008); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020).

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Section 1981 "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citation omitted).

To succeed on his retaliation claim, under Title VII and § 1981, Plaintiff must show that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). And to succeed on his retaliatory hostile work environment claim, Plaintiff must show that: (1) Plaintiff engaged in protected activity, (2) after doing so, Plaintiff was subjected to unwelcome harassment, (3) the harassment was based on his engaging in the protected activity, and (4) the harassment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay Inc.*, 955 F.3d 855, 861-62 (11th Cir. 2020) (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)); *Baroudi v. Sec'y, Dep't of Veterans Affairs*, 616 F. App'x 899, 904 (11th Cir. 2015) (per curiam); *Gowski v.*

16

*Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012). Additionally, a plaintiff must show that the employer is responsible for the hostile work environment under a theory of either direct or vicarious liability. *Jones v. City of Lakeland*, 318 F. App'x 730, 735 (11th Cir. 2008) (per curiam). Under the *Burlington Northern* standard, "the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington Northern*, 548 U.S. at. at 69.

The causal link element of a prima facie case is broadly construed. A plaintiff must establish "the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). "As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020); *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). Awareness of protected activity can be established through circumstantial evidence. *Martin*, 959 F.3d at 1053.

Plaintiff contends that this court should impute Gwinette's knowledge of Plaintiff's complaints to MSB and Shea. In support of this argument, he cites *Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 (11th Cir. 2000). (Doc. # 28 at 35-36). *Breda* was a sexual harassment case addressing employer liability for coworker sexual harassment under Title VII. *Id.* In that context, the issue is whether the employer had actual or constructive notice of the harassment and failed to take prompt remedial action. *See id.* But, in the race retaliation context, the Eleventh Circuit has made clear that the relevant inquiry is whether the decisionmaker who took

17

the adverse action actually knew of the protected activity. *See Martin*, 959 F.3d at 1053; *Shannon*, 292 F.3d at 716: *Brungart*, 231 F.3d at 799.

Plaintiff testified that he complained about the alleged discrimination to Gwinette, and that Gwinette was someone who he thought could receive complaints on MSB's behalf. But Gwinette's knowledge is not at issue. *See Martin*, 959 F.3d at 1053; *Shannon*, 292 F.3d at 716: *Brungart*, 231 F.3d at 799. Rather, Plaintiff must present evidence that Shea, as the decisionmaker, knew of Plaintiff's complaints when he made the decision to terminate Plaintiff. *Id.* It is undisputed that Plaintiff never complained to Shea himself. (Docs. # 23-4 at 141:16-21; 23-8 ¶¶ 8-14). And, there is no Rule 56 evidence that Gwinette informed Shea of Plaintiff's complaints or that Gwinette was involved in the decision to fire Plaintiff. (Docs. # 23-5 ¶¶ 27-29; 23-1 at 15:3-15). Plaintiff has not presented any Rule 56 record evidence that Shea knew of Plaintiff's complaints. *See Anderson*, 477 U.S. at 248. Accordingly, he cannot establish causation, and Defendant's Motion for Summary Judgment as to Plaintiff's retaliation and retaliatory hostile work environment claims under Title VII and § 1981 is due to be granted.

### D.     Plaintiff's Retaliation Claim under the Surface Transportation Assistance Act

The Surface Transportation Assistance Act ("STAA") prohibits employers from retaliating against employees based on complaints or actions related to commercial motor vehicle safety. *See* 49 U.S.C. § 31105(a). The STAA protects an employee who refuses to operate a vehicle because the operation would violate a regulation, standard, or order of the United States related to commercial vehicle safety, health, or security. *Id.* "[A] 'violation' includes 'an act reasonably perceived to be a violation.'" *Fort v. U.S. Dep't of Labor*, No. 20-13998, 2023 WL 155210, at *3 (11th Cir. Jan. 11, 2023)

To succeed on his retaliation claim under the STAA, Plaintiff must show that (1) he engaged in protected activity; (2) the company took an adverse employment action against him; and (3) his protected activity was a contributing factor in the adverse action. 49 U.S.C. § 31105(a) (stating that the legal burdens in 49 U.S.C. § 42121(b) govern complaints under the STAA); *Id.* § 42121(b)(2)(B)(iii); *Jacobs v. U.S. Dep't of Lab.*, 806 F. App'x 832, 834 (11th Cir. 2020). If the plaintiff can make such a showing, the employer can avoid liability by showing, through clear and convincing evidence, that it would have taken the same action in absence of the alleged protected activity. 49 U.S.C. § 42121(b)(2)(B)(iv).

Here, Plaintiff claims that he was terminated because MSB "perceived that he had filed or was about to file a complaint" over what Plaintiff believed were violations of commercial motor vehicle safety regulations. (Doc. # 1 ¶¶ 185-189). The court assumes without deciding that Plaintiff engaged in protected activity when he told Gwinette that he was thinking of calling the Department of Transportation. And, without question, he suffered an adverse employment action when he was terminated. The issue is whether there is a causal connection between any protected activity and Plaintiff's discharge.

"[T]o establish the causal connection," Plaintiff "must show by a preponderance of the evidence that the protected activity was a contributing factor to the adverse action alleged in the complaint." *Brown v. B&D Land Clearing & Logging, LLC*, No. 3:17-CV-01413, 2020 WL 13248680, at *2 (D. Conn. Mar. 3, 2020). As the court explained in its analysis of Plaintiff's Title VII and § 1981 retaliation claims, "a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression." *Martin*, 959 F.3d at 1053; *see also Shannon*, 292 F.3d at 716; *Brungart*, 231 F.3d at 799 ("A decision maker cannot have been motivated to retaliate by something unknown to him."). Accordingly, to establish this

19

retaliation claim, Plaintiff must present evidence that Shea, as the decision maker, knew of Plaintiff's protected activity when he made the decision to terminate Plaintiff.

Plaintiff testified that he told only Gwinette that he was considering calling the Department of Transportation to report MSB, and that he "might have talked to" a welder about reporting MSB. (Doc. # 23-4 at 188:23-189:22). Plaintiff also stated that he reported to Gwinette that his name had been falsified on the February 9 inspection document and that he was considering calling the Department of Transportation. (*Id.* at 147:3-154:16).

Again, however, Shea's knowledge is what matters here. In his declaration, Shea said that Plaintiff "did not complain or report to [him] that he felt MSB was violating any commercial motor vehicle safety regulations," nor did any other MSB employee tell him that Plaintiff was planning to complain about or report MSB. (Doc. # 23-8 ¶¶ 16-21). Plaintiff has presented no evidence that Gwinette told Shea of Plaintiff's plans or that she was involved in the decision to fire him. Nor did Plaintiff file his OSHA complaint until six months after his termination. (Doc. # 1 ¶ 11).

Plaintiff has failed to present Rule 56 evidence that Shea knew Plaintiff was planning to file a complaint about MSB's alleged violations of commercial motor vehicle safety regulations when he fired Plaintiff. *See Anderson*, 477 U.S. at 248. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim under the STAA is due to be granted.

## IV.    Conclusion

For all the above reasons, Defendant's Motion for Summary Judgment is due to be granted in part and denied in part. Further, because the court did not rely on evidence opposed by Defendant's Motion to Strike in ruling on Defendant's Motion for Summary Judgment, Defendant's Motion to Strike is due to be denied as moot. A separate order will be entered.

**DONE** and **ORDERED** this March 10, 2026.

**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE